IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-00057-REB-CBS

SHOP*TV, INC., a Colorado corporation,
        Plaintiff,
v.

BED BATH & BEYOND, INC., a New York corporation, and
EAGLE HOME PRODUCTS, INC., a New York corporation,
        Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Craig B. Shaffer

This civil action comes before the court on: (1) "Defendants' Motion for Summary Judgment" (filed October 30, 2009) (doc. # 49); (2) "Plaintiff's Motion for Partial Summary Judgment" (filed October 30, 2009) (doc. # 50); and (3) "Plaintiff's Motion to Strike Portions of the Second Declaration of Robert Chemtob (Dkt. 54-9)" (filed December 4, 2009) (doc. # 61).  Pursuant to the Order of Reference dated January 20, 2009, designating the Magistrate Judge to "[c]onduct hearings, . . . and submit proposed findings of fact and recommendations for rulings on dispositive motions" (doc. # 4) and the memoranda dated November 2, 2009 (doc. # 51) and December 7, 2009 (doc. # 65), these matters were referred to the Magistrate Judge.  The court has reviewed the Motions, the evidence in the record, the entire case file, the oral arguments presented at the December 18, 2009 hearing, and the applicable law and is sufficiently advised in the premises.

I.      Statement of the Case

        Plaintiff Shop*TV, Inc. ("ShopTV") filed the Complaint on January 14, 2009,

alleging claims for patent infringement, trademark infringement, and trade dress

infringement.  (*See* Complaint (doc. # 1)). ShopTV alleges a claim for infringement of

U.S. Design Patent No. D564,219 issued to Kenneth Bagus on March 18, 2008 (the

"D'219 patent"). The D'219 patent addresses ShopTV's "Carry-On Kit," a travel kit that

contains multiple small empty bottles and jars in a clear one-quart plastic zip-top bag.

ShopTV alleges that Defendants have infringed the D'219 patent by selling a "knock-off"

manufactured in China.  (*See* Complaint).  ShopTV asserts two additional claims for

infringement of the claimed trade dress of ShopTV's carry-on kit product and packaging,

and infringement of ShopTV's PACK-MAX trademark.  (*See* Complaint).

        The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1367.  (*See* Complaint at ¶ 5, Defendants' Second Amended Answer (doc. # 46) at ¶ 5).

Defendants do not contest personal jurisdiction under Colorado's long-arm statute,

Colo. Rev. Stat. § 13-1-124.  (*See* Complaint at ¶¶ 3,4, Defendants' Motion (doc. # 49)

at p. 2 of 27).  Venue is proper in the District of Colorado pursuant to 28 U.S.C. §§

1391(c) and 1400(b).  (*See* Complaint at ¶ 6).

        Defendants Bed Bath & Beyond Inc. ("BB&B") and Eagle Home Products, Inc.

("Eagle") move for summary judgment pursuant to Fed. R. Civ. P. 56(b) on ShopTV's

First Claim for Relief for infringement of the D'219 patent on four grounds: (1) the claim

of the patent does not "particularly point[] out" and "distinctly claim[]" the subject matter

of the invention; (2) the claim of the patent is obvious; (3) the design is functional and

not ornamental; and (4) the Eagle product does not infringe.  Defendants further move

2

for summary judgment on ShopTV's Second Claim for Relief for trade dress infringement on the ground that the claimed trade dress is not protectable because it is functional and not distinctive.

ShopTV moves for partial summary judgment in its favor on: (1) Defendants' Third Defense and Defendant Eagle's Third Counterclaim for declaratory judgment of patent invalidity due to functionality; (2) Defendants' Fourth Defense and Defendant Eagle's Second Counterclaim for declaratory judgment of patent unenforceability due to inequitable conduct; and (3) Defendant Eagle's Fourth Counterclaim for trade libel and product disparagement. The Third Claim for Relief for trademark infringement is not addressed by any of the pending motions. ShopTV has also moved to strike paragraphs 8-11 of Robert Chemtob's Second Declaration (doc. # 54-9) for purposes of the court's consideration of ShopTV's Motion for Partial Summary Judgment. (*See* doc. # 61 at p. 3 of 5).

II.     Standard of Review

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. A dispute is "genuine" if the issue could be resolved in favor of either party. A fact is "material" if it might reasonably affect the outcome of the case.

A movant who does not have the burden of proof at trial must show the absence of a genuine fact issue. By contrast, a movant who bears the burden of proof must submit evidence to establish every essential element of its claim or affirmative defense. In either case, once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. All the evidence must be viewed in the light most favorable to the party opposing the motion. However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence.

3

*Wausau Business Ins. Co. v. U.S. Motels Management, Inc.*, 341 F. Supp. 2d 1180, 1182-83 (D. Colo. 2004) (citations omitted).

III.     Statement of Undisputed Facts

1.       On September 26, 2006, the Transportation Security Administration ("TSA") issued a regulation providing that liquids and gels could be carried onto commercial airlines only if contained in three ounce or smaller containers, placed in a one-quart, transparent, zip-top bag. This regulation became known as the 3-1-1 rule. (Exh. A to Defendants' Motion (Bagus Dep.) (doc. # 49-2) at pp. 19-21, 48-50, 51-53 of 58; ShopTV's Exhibit 2 (doc. # 50-4)).

2.       Prior to the issuance of the TSA 3-1-1 rule, several companies sold travel kits that contained bottles and jars of less than three ounces placed in a one-quart, clear plastic, zip-top bag.  (Exs. B-3 through B-6 to Defendants' Motion (doc. # 49-3) at pp. 15-29 of 41; Exh. C-2 (Second Ciciora Report) doc. # 49-4 at pp. 62-64 of 66; Exh. J (Klein Decl.) (doc. # 49-11) at ¶¶ 3-5; Exs. J-1, J-2 (doc. # 49-11) at pp. 6, 8-9 of 9; ShopTV's Exhs. 7 and 12 (docs. # 50-9 and # 50-14)). These included:

a.       A travel kit sold by Eagle Creek, Inc. (not to be confused with

defendant Eagle Home Products), which has four bottles and two jars

arranged horizontally and vertically in a rectangular, transparent, zip-top

plastic bag. The Eagle Creek product also has a display card attached to

the top of the plastic bag.  (Exh. D to Defendants' Motion (Klein Dep.)

(doc. # 49-5) at pp. 3-6 of 9; Exh. D-1 (doc. # 49-5) at pp. 8-9 of 9; Exh. J

(Klein Decl.) (doc. # 49-11) at ¶¶ 3-6; Exh. B-1 (doc. # 49-3)).

4

b.      The prior art eight-piece "Cosmetic Kit" sold by Defendant Eagle has a transparent plastic receptacle with a zipper enclosure. The bag holds a selection of small containers, including bottles and jars. The containers are packed vertically and horizontally.  (Exh. B-4 to Defendants' Motion (doc. # 49-3) at pp. 18 of 41).

c.      The Japonesque® "Handi Bottle Pack" is a zippered vinyl pouch with six bottles having screw caps, flip top caps and spray caps, arranged vertically.  (Exh. B-5 to Defendants' Motion (doc. # 49-3) at pp. 20-26 of 41).

3.      After learning of the issuance of the 3-1-1 rule, ShopTV's president, Mr. Bagus, developed a carry-on kit comprised of fourteen bottles and jars, each less than three ounces in size, sold in a clear plastic, zip-top bag. (Exh. A to Defendants' Motion (Bagus Dep.) (doc. # 49-2) at pp. 3-4, 19-21 of 58).  ShopTV packaged this kit with a display card featuring red, white, and blue colors, an image of an airplane, and the statement that the carry-on kit was "Airline Approved."  (*Id.* at pp. 7-9 of 58; Exh. A-3 (doc. # 49-2) at pp. 55-58 of 58).

4.      ShopTV began selling its carry-on kit to BB&B in December 2006. (*Id.* at pp. 11-12 of 58).  In 2007, Eagle offered to sell its Travel Mate carry-on kit to BB&B at a price substantially lower than the price charged by ShopTV.  (*Id.* at pp. 13-15 of 58). BB&B stopped purchasing the carry-on kit from ShopTV in December 2007 and began purchasing from Eagle in January 2008.  (Exh. D to Defendants' Motion (Klein Dep.) (doc. # 49-5) at pp. 7 of 9; Exh. B (Chemtob Decl.) (doc. # 49-3) at ¶ 16).

5.      Mr. Bagus applied for and was granted a patent protecting two versions of

5

a carry-on kit on August 1, 2007, both of which issued on March 18, 2008, as the D'218

patent (Exh. E to Defendants' Motion (doc. # 49-6)) and the D'219 patent (Exh. F (doc.

# 49-7)).  Mr. Bagus subsequently assigned the D'219 Patent to ShopTV.  (ShopTV's

Exh. 5 (doc. # 50-7)). ShopTV decided to market the product embodying the patented

design as the Carry-On Kit, to be sold under ShopTV's federally registered trademark

PACK-MAX (Bagus Decl. (doc. # 50-2) at ¶¶ 5, 6).

      6.      ShopTV offered its Carry-On Kit for sale to major retail chain stores,

including BB&B, which started to carry it in its stores in January 2007. (Bagus Decl.

(doc. # 50-2) at ¶ 9).  By March 2007, BB&B was selling approximately 25,000 units of

the Carry-On Kit each month. (*Id.*; Exh. 6 (doc. # 50-8)). In the first half of 2007, BB&B

had sold approximately 130,000 ShopTV Carry-On Kits.  (*Id.*).

      7.      In July 2007, ShopTV learned that BB&B was considering replacing the

Carry-On Kit with another product produced by Eagle.  (Bagus Decl. (doc. # 50-2) at ¶

10).  Eagle was able to sell its Chinese-made product to BB&B at about half the cost of

ShopTV's Carry-On Kit, which was manufactured in the United States. (*Id.* at ¶ 11).

Although ShopTV tried to retain BB&B's business by lowering its wholesale price, it

could not match Eagle's price.  BB&B decided to replace ShopTV's Carry-On Kit with

Eagle's Travel Mate product on or about September 11, 2007.  (Klein Dep. (Exh. 20)

(doc. # 50-22); Stahl Dep. (Exh. 21) (doc. # 50-23); Exh. 22 (doc. # 50-24)).  BB&B

eventually stopped buying the Carry-On Kit, and Eagle's Travel Mate product appeared

in BB&B's stores in January 2008. (*Id.*).  9. After February 2008, and up to June 2009,

BB&B has purchased over 160,000 units of Eagle's Travel Mate product.  (Exh. 6 (doc.

# 50-8)).

8.      The design of the D'219 patent was intended to comply with the TSA 3-1-1 rule.  The TSA 3-1-1 rule provided the motivation for the D'219 patent, and the inspiration to combine elements of the travel kits to meet the requirements of the TSA 3-1-1 rule. (Exh. A (Bagus Dep.) (doc. # 54-2) at pp. 4, 9, 10, 15, 16 of 27).  Mr. Bagus was aware of the TSA Rules and the numerous travel kits that were available at the time of his patent application.  (*Id.* at ¶ 19; Exh. 12 (doc. # 50-14); Exh. A (Bagus Depo.) (doc. # 54-2) at pp.  8 of 27).  Neither the TSA Rules nor the other travel kits were disclosed to the PTO.  (Bagus Decl. (doc. # 50-2) at ¶ 19, Exh. 12 (doc. # 50-14)).

9.      The zip-top bag is transparent and sealable with a zip-top enclosure, allowing easy opening and closing and meeting the requirements of the TSA 3-1-1 rule. (Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 28-29, 32-33 of 58); Exs. A-1 and A-2 (doc. # 49-2) at pp. 48-53 of 58).  The bottles are fitted upright in the bag.  (Exh. A (Bagus Dep.) (doc. # 49-2) at p. 24 of 58). The weight of the containers is divided as equally as possible along the centerline of the package so the package will hang evenly from a display hook.  (*Id.* at p. 30 of 58).

10.      The bottles and jars are of a conventional design and size, commonly available on the wholesale market. (Exh. A (Bagus Dep.) (doc. # 54-2) at p. 4 of 27). The jars have wide openings and screw-top lids, which makes them suitable for creams, gels or pastes. The bottles are taller and thinner, which makes them suitable for liquids. The bottles have screw caps, flip-top caps, or a spray-top.  (Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 5-7, 29 of 58).  Each of the containers in the travel kit is less than three ounces, as required by the TSA 3-1-1 rule.

11.      The display card provides a hanging arrangement for displaying the

product and allows for the package to contain essential product information, such as the identity of the manufacturer, item number, UPC bar code, price, etc. (*Id.* at pp. 27-28, 44-46 of 58);  Exh. J. (Klein Decl.) (doc. # 49-11) at ¶ 7).  The display card is notched to show that the receptacle is a zip-top bag as required by the TSA 3-1-1 rule. (*Id.* at p. 29 of 58;  Exh. C-1 (First Ciciora Report) (doc. # 49-4) at pp. 10, 13 of 66).

12.     The claimed design of the transparent, sealable receptacle is similar to a generic storage bag made of a single sheet of plastic, folded over at the bottom and heat-sealed around the side two edges. The D'219 patent figures indicate that the receptacle is not rigid.  The receptacle of the Eagle Travel Mate product has five separate parts, heat-sealed together to form a box-like construction, and having blue accent strips along the top edge.  The container is of relatively heavy weight plastic that maintains its shape so that the receptacle will stand upright on a sink or countertop. (Exh. C-2 (Second Ciciora Report) (doc. # 49-4) at p. 58 of 66;  Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 35-36 of 58).  The top edge of the D'219 patent has a zip-type closure that creates a fully sealed container. The Travel Mate product has a closure that is an actual zipper with interlocking plastic teeth, and a metal pull ring. The Travel Mate container has openings near the top that prevent it from being completely sealed.  Exh. C-2 (Second Ciciora Report) (doc. # 49-4) at p. 58, 62 of 66; Exh. A (Bagus Dep.) (doc. # 49-2) at p. 35 of 58).  The D'219 patent has a notch in the cardboard display card that calls attention to the tab on the zip top closure. The notch is not present in the Eagle Home product.  (Exh. C-2 (Second Ciciora Report) (doc. # 49-4) at p. 58, 62 of 66; Exh. A (Bagus Dep.) (doc. # 49-2) at p. 35 of 58).  The D'219 patent design has six bottles and eight jars; the Travel Mate kit has seven bottles and seven jars.  (Exh. C-2 (Second

Ciciora Report) (doc. # 49-4) at pp. 62-63 of 66; Exh. A (Bagus Dep.) (doc. # 49-2) at p. 36 of 58).

13.     The configuration of the containers in the patented design has the bottles clustered in two groups: one on the upper right side of the package and the other stacked on the extreme left of the package. The jars are arranged in two stacks: one vertical stack toward the left side of the package and the other a horizontal stack on the bottom right of the package. In the Travel Mate product, six bottles are arranged in a row across the top of the package, with one bottle toward the bottom right of the package. The jars are arranged in two stacks: one horizontal stack at the bottom left of the package and the other is a vertical stack on the bottom right.  (Exh. C-2 (Second Ciciora Report) (doc. # 49-4) at pp. 62-63 of 66;  Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 36-43 of 58).

14.     Nothing in the D'219 patent application, prosecution history or the patent as issued sets forth the "volumetric capacity" of the bag or the containers depicted in Figures 1 through 7; nor do any of the patent documents state how the volumetric capacity might be determined.  (Exh. F (doc. # 49-7); Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 25-26 of 58).  Nowhere in the D'219 patent or its prosecution history is there any reference to the TSA 3-1-1 rule.


IV.    Analysis

A design patent may be obtained for "any new, original, and ornamental design for an article of manufacture."  35 U.S.C. § 171.  A patent confers the right to exclude others from making, using, or selling the invention defined by the claims. 35 U.S.C. §

154.  An issued patent is presumed valid and invalidity must be proved by clear and convincing evidence by the party asserting such invalidity. 35 U.S.C. § 282;  *Bausch & Lomb, Inc. v. Barnes-Hind/ Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed. Cir. 1986).

A.     The D'219 Patent Is Invalid for Indefiniteness

Defendants argue that the D'219 patent is invalid for indefiniteness under Title 35 U.S.C. § 112, which governs what must be contained in the specification and claim of a patent.  *See* 35 U.S.C. § 112 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.").  Indefiniteness is a question of law.  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2008) ("A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.").  *See also Exxon Research and Engineering Company v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) ("A decision holding a patent invalid for indefiniteness presents a question of law . . . .").

A decision as to whether a claim is invalid under this provision requires a determination whether those skilled in the art would understand what is claimed.  *See Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985) (claims must "reasonably apprise those skilled in the art" as to their scope and be "as precise as the subject matter permits").  *See also Exxon*, 265 F.3d at 1375 ("We have stated the standard for assessing whether a patent claim is sufficiently definite to satisfy the statutory requirement as follows: If one skilled in the art would understand the bounds of the claim when read in light of the specification, then the claim satisfies

10

section 112 paragraph 2."). "This standard is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Services, Inc. v. M-I, LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). *See also Exxon*, 265 F.3d at 1375 (standard is met where "the claims at issue [are] sufficiently precise to permit a potential competitor to determine whether or not he is infringing") (citation omitted).

The D'219 patent consists of figures and a written description that limits the scope of the claimed design to "containers of specific configuration and volumetric capacity." The court has construed the D'219 patent as "[t]he design for a travel kit, used as a transparent, sealable receptacle for the included containers of specific configuration and volumetric capacity, as demonstrated in Figures 1 through 7." (*See* doc. # 37). On its face, the D'219 patent is indefinite as to the meaning of "specific volumetric capacity." The D'219 patent does not set forth the "volumetric capacity" of the containers described in Figures 1 through 7. "Neither the '219 patent description nor the '219 drawings demonstrate the size of the transparent, sealable receptacle or the volumetric capacity of" each of the individual containers. (Recommendation of United States Magistrate Judge (doc. # 35 at p. 5 of 7), *approved and adopted by* doc. # 37 ("Order Adopting Recommendation of the United States Magistrate Judge")). The patent does not state how to determine the volumetric capacity. (*See* Statement of Undisputed Facts ("SOF") at ¶ 14).

While ShopTV argues that one of ordinary skill in the art could calculate the size of the bag and the volumetric capacities of the jars and bottles in the D'219 Patent (*see*

doc. # 53 at p. 7 of 21), the volumetric capacity of either the bag or the containers cannot be calculated from the face of the patent.  (Bagus Dep. (doc. # 49-2) at pp. 25-26 of 58).  On its face, the D'219 Patent could depict "a one-gallon bag with very large bottles and jars."  (Bagus Dep. (doc. # 49-2) at p. 26 of 58).  While ShopTV argues that a person skilled in the art would know that the "claimed design is intended for use in a TSA-compliant travel kit" (doc. # 53 at p. 7 of 21), nowhere in the D'219 patent or its prosecution history is there any reference to the TSA 3-1-1 rule.  "[W]hat the patentee subjectively intended his claims to mean is largely irrelevant to the claim's objective meaning and scope".  *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379 (Fed. Cir. 2000).  Regarding ShopTV's argument that the patent must be definite because the court did not identify any ambiguity when the patent was construed, a "prior decision on the issue of claim construction did not obviate the need for a separate validity analysis." *Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1315 (Fed. Cir. 2006) (internal quotation marks and citation omitted).

Neither ShopTV's proposed interpretations nor any other possible construction resolves the ambiguity in the scope of the term "specific volumetric capacity." *See Exxon*, 265 F.3d at 1376 ("If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite.").  As the claimed specific volumetric capacity of the containers cannot be implemented and the scope of the D'219 patent claim cannot be determined by those having ordinary skill in the art, the court concludes that the D'219 patent claim is invalid as indefinite.

B.     The D'219 Patent Is Invalid for Obviousness

Defendants argue that the D'219 patent is invalid for obviousness under 35 U.S.C. § 103.  A patent may not be issued if the subject matter of the invention "would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. § 103(a).  "Section 103 applies to design patents in much the same manner as it applies to utility patents." *In re Haruna*, 249 F.3d 1327, 1335 (Fed. Cir. 2001) (citation omitted).  *See also In re Borden*, 90 F.3d 1570, 1574 (Fed. Cir. 1996) ("Design patents are subject to the same conditions on patentability as utility patents, including the nonobviousness requirement of 35 U.S.C. § 103.") (citation omitted).

Obviousness is a question of law for the court to decide.  *See In re Rouffet*, 149 F.3d 1350, 1355 (Fed. Cir. 1998) (ultimate conclusion of obviousness a question of law).  "Obviousness is ultimately a question of law that rests on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective considerations of nonobviousness." *Advanced Display Systems, Inc. v. Kent State University*, 212 F.3d 1272, 1284-85 (Fed. Cir. 2000) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)).  *See also Storage Technology Corp. v. Quantum Corp.*, 370 F. Supp. 2d 1116, 1123 (D. Colo. 2005) ("Obviousness is a question of law to be determined based on the following factual considerations: (1) the scope of the prior art; (2) the differences between the prior art and the claims at issue, and (3) the level of ordinary skill in the pertinent art.") (citing *Graham*, 383 U.S. at 17-18).

Section 103 "forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' " *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 405 (2007) (quoting 35 U.S.C. § 103).[1]  A patent claim is obvious if there existed at the time of invention a "known problem for which there was an obvious solution encompassed by the patent's claims."  *KSR*, 550 U.S. at 420.  "In the design patent context, the ultimate inquiry under section 103 is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved."  *Durling v. Spectrum Furniture*, 101 F.3d 100, 103 (Fed. Cir. 1996) (citation omitted), *distinguished on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679 (Fed. Cir. 2008).  "More specifically, the inquiry is whether one of ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design."  *Id.*

Prior to the invention of the design claimed in the D'219 patent, TSA issued the 3-1-1 rule and several companies sold travel kits that also contained bottles and jars of less than three ounces placed in a one-quart, clear plastic, zip-top bag.  (SOF at ¶ 1, 2).  For example, the travel kit sold by Eagle Creek, Inc., has four bottles and two jars arranged horizontally and vertically in a transparent plastic bag.  The Eagle Creek product also has a display card attached to the top of the plastic bag.  (SOF ¶ 2(a)).

---

[1]      "[I]t is not obvious that the Supreme Court necessarily intended to exclude design patents from the reach of *KSR*."  *Titan Tire v. Case New Holland, Inc.*, 566 F.3d 1372, 1384 (Fed. Cir. 2009).

Similarly, the prior art travel kit manufactured by Defendant Eagle is a clear, resealable bag that holds a variety of bottles and jars aligned in a horizontal and vertical configuration. (SOF ¶ 2(b)). A third alternative is the Japonesque® kit, which includes every style of bottle shown in the D'219 patent. (SOF 2(c)).

The D'219 patent depicts a resealable plastic bag, which holds six bottles and eight jars arranged in a horizontal and vertical configuration. The bag has a display card with a notch in one corner that reveals the zip-tab. (SOF at ¶ 12). The prior art carry-on kits identified above have fewer containers, but otherwise show all of the basic design characteristics of the D'219 patent. For example, the only difference between the claimed invention in the D'219 patent and the Eagle Creek travel bottle set is the number of and type of containers. It was known in the art that the number and size of containers in a travel kit could vary, and the type and style of the containers used in the D'219 patent were readily available. (Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 17-18, 31 of 58; Exh. C-1 (First Ciciora Report) (doc. # 49-4) at pp. 11-15 of 66). The three prior art travel kits individually and in combination have the basic design features claimed in the D'219 patent. It would have been obvious to one skilled in the art to use the design features of the prior art products, add additional containers, and thereby create the same overall visual appearance as the claimed design.

The problem posed by the design of the D'219 patent was the desire to add additional containers to the existing, prior art travel kits. Under *KSR*, the question is whether it would have been obvious to one skilled in the art that the design in the D'219 patent could be achieved simply by adding more bottles and jars in a horizontal and vertical arrangement. The prior art plainly included travel kits with containers configured

15

in horizontal and vertical arrangements. The court concludes that it would have been patently obvious to one skilled in the art that the design in the D'219 patent could be achieved simply by adding more bottles and jars to the horizontal and vertical arrangement found in the prior art travel kits.  *See KSR*, 550 U.S. at 401 ("a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.").

"[T]he focus in a design patent obviousness inquiry should be on visual appearances rather than design concepts."  *Durling*, 101 F.3d at 104 (citation omitted). There is nothing unusual, ornamental or decorative about the arrangement of the containers described in the D'219 patent.  For example, additional containers could be added to the Eagle Creek bottle set to meet the identified design objective, whereby the Eagle Creek kit would be virtually the same as the claimed design.  *See In re Borden*, 90 F.3d at 1574 ("In order for a design to be unpatentable because of obviousness, there must first be a basic design reference in the prior art, a something in existence, the design characteristics of which are basically the same as the claimed design."). "KSR instructs the lower courts to focus on the essential requirements of 35 U.S.C. § 103 and perform a flexible, functional, and expansive analysis of obviousness guided by common sense and rooted in the *Graham* considerations."  *Oatey Co. v. IPS Corp.*, ___ F. Supp. 2d ___, 2009 WL 3242048 * 24 (N.D. Ohio (Sept. 30, 2009)).  Applying this approach, the court concludes that the D'219 patent is obvious as a matter of law.

C.      The D'219 Patent is Invalid as Primarily Functional

Defendants argue that the D'219 patent is invalid as primarily functional rather
than ornamental.  *See OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405
(Fed. Cir. 1997) ("A design patent only protects the novel, ornamental features of the
patented design," not the functional elements) (citations omitted);  *Elmer v. ICC
Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995) ("A design patent protects the
nonfunctional aspects of an ornamental design as shown in the patent.") (citation
omitted).  To be invalid based upon functionality, the claimed design need not be
dictated solely by function as ShopTV argues.  A design patent is invalid when it "is
*primarily* functional rather than ornamental."  *PHG Techs., LLC v. St. John. Cos.*, 469
F.3d 1361, 1366 (Fed. Cir. 2006) (emphasis added) (citing *Power Controls Corp. v.
Hybrinetics, Inc.*, 806 F.2d 234, 238 (Fed. Cir. 1986) ("If the patented design is *primarily*
functional rather than ornamental, the patent is invalid.") (emphasis added)).  *See also*
"Manual for Patent Examining Procedure" § 1504.01(c) (Exh. K) (doc. # 64-2) at p. 7 of
11;  *Hupp v. Siroflex*, 122 F.3d 1456, 1461 (Fed. Cir. 1997) (finding design patent valid
where design "was primarily ornamental within the meaning of design patent law").
"[T]he determination of whether the patented design is dictated by the function of the
article of manufacture must ultimately rest on an analysis of its overall appearance."
*Berry Sterling Corp. v. Pescor Plastics, Inc.*, 122 F.3d 1452, 1455 (Fed. Cir. 1997)
(citation omitted).

"In determining whether a design is primarily functional, the purposes of the
particular elements of the design necessarily must be considered."  *Power Controls*, 806
F.2d at 240.  The undisputed facts establish that the D'219 design is composed mainly

17

of functional elements.  The bag is transparent and sealable with a zip-top enclosure.  (SOF at ¶¶ 9, 12).  The bag serves the functional purpose of allowing the contents of the bag to be seen by security personnel, as dictated by the TSA 3-1-1 rule.  (SOF at ¶¶ 1, 3).  The individual containers also are functional, to contain liquids and creams.  (SOF at ¶ 10).  Each type of bottle and jar has a clear purpose: some bottles are designed with spray caps, some with push-tops.  *Id.*  All of the containers are of a conventional design and are commonly available.  They are all designed to serve the functional purpose of complying with the TSA 3-1-1 rule, while providing travelers with an assortment of bottles and creams.  The individual containers are thus purely functional, and do not represent ornamentation in and of themselves.

The specific arrangement of the containers also is primarily functional.  First, arranging the containers in a vertical and horizontal way allows for efficient use of the space within the container.  The horizontal and vertical orientation of the containers is similar to the arrangement found in the prior art.  The containers are arranged to fit in the bag and thereby minimize the depth of the bag so it easily fits into the external pockets of carry-on luggage.  (Exh. A (Bagus Dep.) (doc. # 49-2) at p. 24 of 58; Exh. K (Second Chemtob Decl.) (doc. # 54-9) at ¶¶ 4-5.  Moreover, arranging the containers in neat vertical and horizontal rows significantly enhances the visual appearance and marketability of the travel kit.  (Exh. K (Second Chemtob Decl.) (doc. # 54-9) at ¶ 6).  The arrangement also allows users to read the labels of the containers and/or otherwise visually identify their contents.  (Exh. C-1) (First Ciciora Report) (doc. # 49-4) at p. 10 of 66).  The weight of the containers is divided as equally as possible along the centerline of the package so the package will hang evenly from a display hook.  (SOF at ¶ 9).

18

The display card serves a functional purpose in providing a display for essential product description and usage information and providing a means for hanging the travel kit for sale.  (SOF at ¶ 11). The display card has a notch in one corner. This notch serves the functional purpose of accommodating the tab of the plastic bag.  *Id.*  The primarily functional nature of the D'219 design is also demonstrated by the absence of any purely ornamental or decorative features.  (*See* Exh. G (Meyer Dep.) (doc. # 49-8) at pp. 3-4 of 17).

"The presence of alternative designs may or may not assist in determining whether the challenged design can overcome a functionality challenge." *Berry Sterling Corp.*, 122 F.3d at 1456.  "[A]lternative designs join the list of other appropriate considerations for assessing whether the patented design as a whole – its overall appearance – was dictated by functional considerations." *Id.* ShopTV's purported alternative designs have different numbers, sizes and configurations of containers. (*See* Exhs. 7, 11, 12 (docs. # 50-9, # 50-13, 50-14; Exhs. B-3, B-4, B-5 (doc. # 49-3 at pp. 14-26 of 41).  None contain six bottles and eight jars, as required by the D'219 Patent, much less six bottles and eight jars of the same relative sizes as in the D'219 Patent.  These designs do not provide sufficient evidence that the D'219 Patent design is not functional.

"The chief limitation on the patentability of designs is that they must be primarily ornamental in character. If the design is dictated by performance of the article, then it is judged to be functional and ineligible for design patent protection." *Arminak 7 Associates, Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (fed. Cir. 2007) (quoting *Best Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566 (Fed. Cir. 1996).

19

Any aesthetic appeal of the Carry-On Kit is the inevitable result of its functional

concerns.  The court concludes that the D'219 design patent is invalid as primarily

functional.[2]


D.      Eagle's Product Does Not Infringe the D'219 Patent.

A design patent may be obtained for "any new, original, and ornamental design

for an article of manufacture."  35 U.S.C. § 171.  A design patent is defined by the

content of its drawing.  *See Egyptian Goddess*, 543 F.3d at 679 ("a design is better

represented by an illustration than it could be by any description and a description

would probably not be intelligible without the illustration"), *reh'g en banc denied* (Nov. 4,

2008), *cert. denied*, 129 S.Ct. 1917 (2009).  *See also HR U.S. LLC v. Mizco*

*International, Inc.*, 2009 WL 890550 * 9 (E.D.N.Y. 2009) ("A design patent's claim is

limited to what is shown in the application drawings.") (internal quotation marks and

citation omitted);  *Dexas International, Ltd. v. Office Max, Inc.*, 2009 WL 252164 (E.D.

Tex. 2009) ("The figures in [a] design patent not only comprise the bulk of the

disclosure, but also set forth the limits of the claim.") (citation omitted).  It is "the

drawings in the patent, not just one feature of the claimed design, that define the

patented design."  *Amini Innovation Corp. v. Anthony California, Inc.*, 439 F.3d 1365,

1370 (Fed. Cir. 2006).

---

[2]      The court's conclusion as to the functionality of the D'219 patent is also
dispositive of ShopTV's Motion for Partial Summary Judgment in its favor on
Defendants' Third Defense of invalidity of the '219 Patent due to functionality and
Eagle's Third Counterclaim for declaratory judgment that the '219 Patent is invalid due
to functionality.

The D'219 patent is also defined by the court's construction of the claim.  The D'219 patent describes the claimed travel kit as "a transparent, sealable receptacle for the included containers of specific configuration and volumetric capacity."  (*See* doc. # 1-3).  On July 8, 2009, adopting the Recommendation of the Magistrate Judge, the court construed the D'219 patent as "[t]he design for a travel kit, used as a transparent, sealable receptacle for the included containers of specific configuration and volumetric capacity, as demonstrated in Figures 1 through 7."  (*See* doc. # 37).  The D'219 patent is not merely defined by the design set forth in the figures, but also is expressly limited to cover only those designs which exhibit the "specific configuration and volumetric capacity" of the containers described in the figures.  ShopTV has acknowledged the court's construction of the singular term "specific configuration" and the singular term "volumetric capacity" as both modifying the plural term "included containers."  The term "specific configuration" is defined only by the D'219 drawings.  The D'219 drawings demonstrate the "specific configuration" of "the included containers."  (*See* doc. # 1-3 at pp. 2-5 of 5).  The D'219 drawings demonstrate "the included containers" as 14 containers, including one spray bottle.  (*See* doc. # 1-3 at pp. 2-5 of 5).  Neither the D'219 patent description nor the D'219 drawings demonstrate the size of the "transparent, sealable receptacle" or the "volumetric capacity" of each individual container.  (*See id.*).

Infringement of a design patent is the unauthorized manufacture, use, or sale of the article embodying the patented design or any colorable imitation thereof.  35 U.S.C. § 289.  In infringement analysis, "the claim as properly construed must be compared to the accused design to determine whether there has been infringement."  *Elmer*, 67 F.3d

at 1577.  The patent holder asserting the infringement claim has the burden of proving

infringement by a preponderance of the evidence.  *Egyptian Goddess*, 543 F.3d at 678-

79.

      In judging infringement of a design patent, the finder of fact determines whether

the "ordinary observer," familiar with the prior art, would be deceived into believing that

the accused design is the same as the patented design.  *Egyptian Goddess*, 543 F.3d

at 681.  The ordinary observer test is:

> if, in the eye of an ordinary observer, giving such attention as a purchaser
> usually gives, two designs are substantially the same, if the resemblance
> is such as to deceive such an observer, inducing him to purchase one
> supposing it to be the other, the first one patented is infringed by the other.

*Gorham Co. v. White*, 81 U.S. 511, 528 (1871).  "The ordinary observer is not any

observer, but one who, with less than the trained faculties of the expert, is a purchaser

of things of similar design, or one interested in the subject."  *Arminak & Associates, Inc.*

*v. Saint-Gobain Calmar, Inc.*, 424 F. Supp 2d 1188, 1196 (C.D. Cal. 2006) (internal

quotation marks and citation omitted).  Because the accused product is sold primarily to

the general public, the ordinary observer in this case is a retail consumer who is familiar

with the prior art.  The ordinary observer is therefore a member of the public who is

shopping for or has recently purchased a travel kit, a "purchaser of things of similar

design."  *Id.*

      Under the ordinary observer test, "infringement will not be found unless the

accused article embod[ies] the patented design or any colorable imitation thereof."

*Egyptian Goddess*, 543 F.3d at 678 (internal quotation marks and citations omitted).

"The criterion is deception of the ordinary observer."  *L.A. Gear, Inc. v. Thom McAn*

*Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993). The question, then, "is whether the ordinary observer would be deceived by the accused design because it is substantially similar to the patented design." *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1118 (Fed. Cir. 1998).

In applying the ordinary observer test, "[c]ourts should take into account similarities and differences" between the patented and accused designs. *FMC Corp. v. Hennessy Indus., Inc.*, 836 F.2d 521, 527 (Fed. Cir. 1987). "For a design patent to be infringed, however, no matter how similar two items look, the accused device must appropriate the novelty in the patented device that distinguishes it from the prior art." *Kohler Co. v. Moen, Inc.*, 12 F.3d 632, 638 n. 8 (7th Cir. 1993) (internal quotation marks and citations omitted). The ordinary observer test further requires evaluation of the appearance of a design in its entirety, considering "all of the ornamental features illustrated in the figures." *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1378 (Fed. Cir. 2002), *abrogated on other grounds by Egyptian Goddess*, 543 F.3d at 665. "[T]he patented and accused designs do not have to be identical in order for design patent infringement to be found. . . . What is controlling is the appearance of the design as a whole in comparison to the accused product."). *Contessa*, 282 F.3d at 1376 (internal citations omitted).

The transparent, sealable receptacle of the D'219 design is little more than a generic plastic zip-top storage bag. The drawings indicate that the receptacle is not rigid. The receptacle of the Eagle Travel Mate product is of a more elaborate construction, having five separate parts, heat-sealed together to form a box-like construction, and having blue accent strips along the top edge. The Eagle product

23

container is of a heavier weight plastic than the Carry-On Kit and maintains its shape so that the receptacle will stand upright on a sink or countertop.

The top edge of the D'219 patent has a zip-type closure that creates a fully sealed container. The Travel Mate product has a closure that is an actual zipper with interlocking plastic teeth and a metal pull ring.  The Travel Mate container has openings near the top that prevent it from being completely sealed. The D'219 design also has a notch in the cardboard display card that calls attention to the tab on the zip-top closure. The notch is not present in the Eagle product.

The D'219 patent design has six bottles and eight jars; the Travel Mate kit has seven bottles and seven jars.  The containers in the Eagle Travel Mate kit are in a different arrangement from the patented design.  The court has construed the D'219 patent to include "containers of specific configuration and volumetric capacity."  The D'219 patent is silent about the "volumetric capacity" of the included containers.  While ShopTV asserts that the D'219 patent is not limited to the specific arrangement of the containers relative to one another, as shown in Figures 1 through 7 (*see* ShopTV's Response (doc. # 53) at p. 13), the court has construed the claim as limited to the specific number, configuration, and volumetric capacity of the jars and bottles depicted in the illustrations.  ShopTV argues that "[a] person skilled in the art and knowledgeable about TSA regulations would know that the patent shows a one quart bag and would be able to determine the relative height of the bag, the sizes of the containers," and the volumetric capacity of the containers shown in the D'219 patent.  (Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (doc. # 53) at pp. 7-8 of 21).  However, the evidence in the record simply does not show that Defendants'

product contains the same number, configuration, or volumetric capacity as the D'219 patent.

The court concludes that there are sufficient differences between the appearance of the design as a whole in the D'219 patent and the Eagle Travel Mate product such that the ordinary observer would not be deceived by the accused design.  The overall appearance and visual effect of the Travel Mate carry-on kit is similar to the prior art, with more jars and bottles.  *See Egyptian Goddess*, 543 F.3d at 678 (""resolution of the question whether the ordinary observer would consider the two designs to be substantially the same will benefit from a comparison of the claim and accused designs with the prior art").  "Where there are many examples of similar prior art designs . . . differences between the claimed and accused designs that might not be noticeable in the abstract can become significant to the hypothetical ordinary observer who is conversant with the prior art."  *Id.* at 678.  "Where the frame of reference consists of numerous similar prior art designs, those designs can highlight the distinctions between the claimed design and the accused design as viewed by the ordinary observer."  *Id.* at 677.  In sum, the court concludes that the Eagle Travel Mate carry-on kit does not infringe the D'219 patent.

E.    Defendants' Fourth Defense and Eagle's Second Counterclaim for Inequitable
      Conduct

Defendants bring their Fourth Defense and Eagle brings its Second Counterclaim for unenforceability of the D'219 patent based on inequitable conduct by Mr. Bagus and/or his attorney, Lee Meyer.  (*See* Second Amended Answer and Counterclaims

(doc. # 46) at pp. 6, 10 of 15). Defendants argue that Mr. Bagus and/or Mr. Meyer committed inequitable conduct by not disclosing to the PTO: (1) the TSA Rules; and (2) certain travel kits that existed on the market before the Carry-On Kit. (*See* Second Amended Answer and Counterclaims (doc. # 46) at pp. 10-11 of 15, ¶¶ 22-34; Responses to Interrogatories Nos. 16 and 17 (Exh. 13) (doc. # 50-15) at p. 10 of 14).

Inequitable conduct is an equitable defense to patent infringement. District courts may delegate factual inquiries as well as the ultimate question of inequitable conduct to the jury. *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009) (citation omitted). "To prevail on an inequitable conduct charge, a defendant must present 'evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].'" *Rothman*, 556 F.3d at 1323 (quoting *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007)). "Both of these factual elements require proof by clear and convincing evidence." *Id*. Once a defendant establishes a prima facie case of inequitable conduct, the burden shifts to the plaintiff to provide a credible explanation for the material omission. *Ferring B.V. v. Barr Laboratories, Inc.*, 437 F.3d 1181, 1192 (Fed. Cir. 2006). "If it finds materiality and intent, a district court must then balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable." *Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 518 F.3d 1353, 1366 (Fed. Cir. 2008) (internal quotation marks and citation omitted).

The materiality of a prior art product turns on whether "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a

26

patent." *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1297 (Fed. Cir. 2008) (quotation omitted).

> [I]nformation is material to patentability when it is not cumulative of information already of record or being made of record in the application, and (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2) [i]t refutes, or is inconsistent with, a position the applicant takes in: (i) [o]pposing an argument of unpatentability relied on by the Office, or (ii) [a]sserting an argument of patentability.

37 C.F.R. § 1.56(b) (2008). "A misstatement or omission may be material even if disclosure of that misstatement or omission would not have rendered the invention unpatentable." *Pfizer*, 518 F.3d at 1366. Information is material "when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357,1367 (Fed. Cir. 2008) (internal quotation marks and citation omitted), *cert. denied*, 129 S.Ct. 1595 (2009).

"An inference of intent to deceive is generally appropriate . . . when (1) highly material information is withheld; (2) the applicant knew of the information [and] . . . knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313–14 (Fed. Cir. 2008) (internal quotation marks and citations omitted). *See also GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001) ("The intent element of the offense is therefore in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred."). "This requires a careful balancing: when the misrepresentation or withheld information is highly material, a lesser quantum of proof is needed to establish the

requisite intent.  In contrast, the less material the information, the greater the proof must be."  *Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*, 438 F.3d 1123, 1128-29 (Fed. Cir. 2006) (citations omitted).  In light of this balancing, "a grant of summary judgment on the issue of inequitable conduct is permissible, but uncommon.  Generally . . . the concerns attendant to awards of summary judgment on inequitable conduct relate to the inherently factual nature of the issue of intent."  *Digital Control v. Charles Machinery*, 437 F.3d 1309, 1317 (Fed. Cir. 2006).

It is undisputed that the D'219 patent was intended to comply with the TSA 3-1-1 rule.  (SOF ¶8;  Exh. A (Bagus Dep.) (doc. # 49-2) at p. 5 of 58; Exh. G (Meyer Dep.) (doc. # 54-7) at pp. 9-10 of 17).  The TSA 3-1-1 rule required that the receptacle be one quart in size, made of clear plastic, and resealable and that the containers in the receptacle be no larger than three ounces.  (SOF ¶ 1;  "Plaintiff's Opening Claim Construction Brief" (doc. # 27) at p. 10 of 11 n.1;  Exh. A (Bagus Dep.) (doc. # 49-2) at pp. 3, 21, 28-29, 33, of 58;  Exs. A-1 and A-2 (doc. # 49-2 at pp. 47-53 of 58); Exh. 14 (Bagus Dep.) (doc. # 50-16) at pp. 5-10 of 11; Exh. A (doc. # 54-2) at p. 16 of 27).  The TSA 3-1-1 rule and the travel kits disclose several salient features that, when taken in combination with other prior art, raise questions of the D'219 Patent's patentability under § 103, including: (1) a display card with a cutout notch to accommodate the zip-tab; (2) bottles and jars of less than three ounces; (3) "transparent plastic receptacles with a zipper enclosure…" that "hold a selection of  small containers, including bottles and jars;" and (4) the vertical and horizontal arrangement of the containers within the bag. (SOF ¶¶ 9-13;  Exh. B (Chemtob Decl.) ¶¶ 8-13).  There is no dispute in this case that Mr. Bagus was aware of the TSA Rules at the time of his patent

application.  (Bagus Decl. (doc. # 50-2) at ¶ 19).  There is no dispute that Mr. Bagus was aware of various travel kits that were being sold at the time.  *Id.*  Finally, there is no dispute that neither Mr. Bagus nor Mr. Meyer disclosed the TSA Rules or the prior art travel kits to the PTO.  *Id.*; *see also* Exh. 12 (doc. # 50-14).  There is evidence that the rendition of a travel kit in the TSA 3-1-1 rule was at least as comparable to the design claimed in the D'219 Patent as the references found by the patent examiner and cited on the face of the patent.  (Exh. G (Meyer Dep.) (doc. # 54-7 at pp. 4-5 of 17).  Because the prior art discloses both the elements of the D'219 Patent and the motivation to combine them, a reasonable examiner would consider both the TSA 3-1-1 rule and the cited travel kits to be material to the patentability of the D'219 patent.

The explanation provided by Mr. Bagus and Mr. Meyer for withholding the TSA 3-1-1 rule and other prior art references, that neither of them believed that this prior art was material to the patentability of the claimed design, presents a credibility determination for a jury to make.  (*See* Exh. 14 (Bagus Dep.) (doc. # 50-16) at pp. 5-10 of 11;  Exh. 15 (Meyer Dep.) (doc. # 50-17) at pp. 3-7 of 9).

> [A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish "subjective good faith"sufficient to prevent the drawing of an inference of intent to mislead. . . . A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice.

*GFI, Inc.*, 265 F.3d at 1275.

Given the materiality of the TSA 3-1-1 rule and the other prior art, there are at least genuine issue of material fact concerning whether Messrs. Bagus and/or Meyer withheld the TSA 3-1-1 rule and the other prior art with the intent to deceive the USPTO

or have provided a credible explanation for the failure to disclose the TSA 3-1-1 rule and the prior art travel kits.  The court concludes that sufficient evidence exists in the record to create a genuine issue of fact concerning inequitable conduct.  Thus, summary judgment is properly denied at this time as to Defendants' Fourth Defense of unenforceability of the D'219 Patent due to inequitable conduct and Eagle's Second Counterclaim for declaratory judgment that the '219 Patent is unenforceable due to inequitable conduct.

F.      Second Claim for Relief for Trade Dress Infringement

Defendants further move for summary judgment on ShopTV's Second Claim for Relief for trade dress infringement on the ground that the claimed trade dress is not protectable because it is a functional design for packaging, lacks inherent distinctiveness, and there is insufficient evidence of secondary meaning.

"Trademarks and trade dress are separate and distinct causes of action under the Lanham Act . . . ."  *General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006) (citations omitted), *cert. denied*, 552 U.S. 819 (2007).  "Trade dress is the packaging and general presentation of a product."  *Hupp*, 122 F.3d at 1466 (citation omitted).  *See also General Motors*, 468 F.3d at 414 ("Trade dress has been described by the Supreme Court as the design or packaging of a product which has acquired a secondary meaning sufficient to identify the product with its manufacturer or source.") (internal quotation marks and citation omitted).

> Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that]

30

> make[s] the source of the product distinguishable from another and ...
> promote[s] its sale. Trade dress involves the total image of a product and
> may include features such as size, shape, color or color combinations,
> texture, graphics, or even particular sales techniques.

*Id.* at 414 (citation omitted).

Trade dresses are protectable under section 43(a) of the Lanham Act, which

provides a private cause of action against any person who

> in connection with any goods or services, or any container for goods, uses
> in commerce any word, term, name, symbol, or device, or any
> combination thereof . . .  which. . . is likely to cause confusion, or to cause
> mistake, or to deceive . . . as to the origin, sponsorship, or approval of his
> or her goods . . . by another person.

15 U.S.C. § 1125(a)(1)(A).  "A party seeking to recover for trade dress infringement

must prove by a preponderance of the evidence that (1) the trade dress is not

functional; (2) the trade dress is distinctive in the marketplace and has acquired

'secondary meaning,' thereby indicating the source of the goods; and (3) the trade dress

of the accused product is confusingly similar."  *General Motors*, 468 F.3d at 414 (citation

omitted).  *See also General Motors Corp. v. Urban Gorilla*, 500 F.3d 1222, 1227 (10th

Cir. 2007) ("To establish a claim of trade dress infringement, a plaintiff must show: (1)

[t]he trade dress is inherently distinctive or has become distinctive through secondary

meaning; (2) [t]here is a likelihood of confusion among consumers as to the source of

the competing products; and (3) [t]he trade dress is nonfunctional.");  *Hartford House,*

*Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268, 1271 (10th Cir. 1988) (for a plaintiff to

prevail on a trade dress infringement claim, "(1) the trade dress, whether a single

feature or a combination of features, must be nonfunctional; (2) the trade dress must

have acquired a secondary meaning; and (3) there must be a likelihood of confusion

31

among consumers as to the source of the competing products.").

ShopTV asserts that "[t]he trade dress of the Carry-On Kit encompasses its overall image and appearance comprising: (1) a rectangular, transparent bag which is slightly wider than it is tall; (2) inside the bag are multiple containers neatly stacked in vertical columns and horizontal rows; (3) also inside the bag, and visible from the front of the package, is a sheet consisting of labels identifying various liquids and gels; (4) the top of the bag is attached to a cardboard card whose width is generally equal to the width of the bag and whose height is about one half of the height of the bag; (5) the card has a predominantly red bottom portion and blue top portion, with a large passenger airplane being predominantly featured in the top half of the card."  (Exh. H ("Plaintiff's Response to Defendants' Interrogatory No. 9") (doc. # 49-9);  Exh. A-3 (doc. # 49-2) at pp. 55-58 of 58).  ShopTV further asserts that "the trade dress of the Carry-On Kit encompasses its overall image and appearance . . . ."  (Plaintiff's Response (doc. # 53) at p. 14 of 21 (internal quotation marks and citations omitted).  *See Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989) ("The trade dress of a product is essentially its total image and overall appearance.") (internal quotation marks omitted).

Defendants first argue on an element-by element basis that the Carry-On Kit is functional.  "We consider several factors in determining whether trade dress is functional: (1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture."  *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d

1252, 1260 (9th Cir. 2001) (internal quotation marks and citation omitted).  "The burden

of proof is placed on the party asserting the non-functionality of the trade dress."

*Switchmusic.com, Inc. v. U.S. Music Corp.*, 416 F. Supp. 2d 812, 820 (C.D. Cal. 2006)

(citation omitted).  "Whether trade dress is functional is a question of fact for the jury.

Thus, any disputes of material fact will preclude summary judgment."  *Keystone Mfg.*

*Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 560 (W.D.N.Y. 2005) (citations

omitted).  *See also R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 80 (S.D.N.Y. 2009)

("whether a trade dress is functional for purposes of the Lanham Act is essentially a fact

question.") (internal quotation marks and citation omitted).

 "[T]he appropriate inquiry is not whether each individual feature of the trade

dress is functional but whether the whole collection of features, taken together, is

functional."  *General Motors Corp. v. Urban Gorilla*, 500 F.3d at 1227 (citations omitted).

"The fact that individual elements of the trade dress may be functional does not

necessarily mean that the trade dress as a whole is functional; rather, functional

elements that are separately unprotectable can be protected together as part of a trade

dress."  *Adidas-Salomon AG v. Target Corp*, 228 F. Supp. 2d 1192, 1195 (D. Or. 2002)

(citation omitted).  The "creation and arrangement of individual product features into a

particular overall design may itself constitute a non-functional product feature."  *Hartford*

*House*, 846 F.2d at 1272 (internal quotation marks and citation omitted).  "A

combination of features may be nonfunctional and thus protectable, even though the

combination includes functional features."  *Id.*

 ShopTV has raised factual considerations whether the plastic transparent bag,

the containers stacked in vertical columns and horizontal rows, the sheet of adhesive

labels that may be applied to containers to identify their contents, the display card attached to the top of the bag, and the airplane design on the display card are functional, citing Exhibits A-1 (doc. # 49-2 at pp. 48-50 of 58), A-2 (doc. # 49-2 at pp. 52-53 of 58), B-4 (doc. # 49-3 at p. 18 of 41), I (doc. # 49-10 at pp. 4-6 of 7), 3 (doc. # 50-5), 7 (doc. # 50-5), 11 (doc. # 50-13), 12 (doc. # 50-14), Bagus Decl. (doc. # 50-2) at ¶¶ 6-7.  Viewing the evidence in the light most favorable to ShopTV, the court cannot determine at this time that no genuine issues of material fact exist as to whether ShopTV's claimed trade dress is functional.  *See, e.g., Coach, Inc. v. We Care Trading Co., Inc.*, 67 Fed. Appx. 626, 629 (2d Cir. 2002) (denying summary judgment because "the jury reasonably could have concluded that Coach's trade dress was not functional");  *E-Z Bowz, L.L.C. v. Professional Prod. Research Co., Inc.*, 2005 WL 535065 at *9 (S.D.N.Y. March 8, 2005) (denying summary judgment because the evidence, "when viewed in the light most favorable to [the plaintiff], could lead a reasonable jury to conclude that the trade dress at issue, when considered as a whole, is non-functional").

As the court determines that genuine issues of material fact remain as to whether the claimed trade dress is functional, and as a functional trade dress is unprotectable regardless of its distinctiveness, the court need not determine at this time whether the trade dress is distinctive.  *See Traffix Devices*, 532 U.S. at 27 (functionality having been established, whether the design has acquired secondary meaning need not be considered), 33 ("Where the design is functional . . . there is no need to proceed further to consider if there is a competitive necessity for the feature.").  *See also Union Carbide Corp. v. Fred Meyer, Inc.,* 619 F. Supp. 1028, 1034 (D. Or. 1985) ("secondary meaning

34

with respect to the design of the container cannot be considered, because it is functional and as a matter of law may not be protected.").

G.      Fourth Counterclaim for Trade Libel and Product Disparagement.

Defendant Eagle brings its Fourth Counterclaim for common law unfair competition based on alleged false factual statements made by ShopTV regarding Eagle's travel kit in an effort to dissuade BB&B from purchasing Eagle's travel kits. (*See* Second Amended Answer and Counterclaims (doc. # 46) at pp. 12-13 of 15). "With respect to trade disparagement, Colorado has adopted the following definition from the Restatement:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
> (b) he knows that the statement is false or acts in reckless disregard to its truth or falsity.

*Pfenninger v. Exempla, Inc.*, 116 F. Supp. 2d 1184, 1197-98 (D. Colo. 2000) (quoting Restatement (Second) of Torts § 623(A) (1976)).  "The tort of product disparagement requires proof of the following elements: (1) a false statement; (2) published to a third party; (3) derogatory to [Eagle's] business in general, to the title to its property, or its quality; (4) through which [Shop*TV] intended to cause harm to [Eagle's] pecuniary interest, or either recognized or should have recognized that it was likely to do so; (5) with malice; (6) thus, causing special damages.  *Teilhaber Mfg. Co. v. Unarco Materials Storage*, 791 P.2d 1164, 1166-1167 (Colo. App. 1989) (citations omitted).  Evidence of statements made with "knowledge of the falsity or reckless disregard for the truth"

supports a showing of the "type of malice that is required to sustain a cause of action for disparagement." *Williams v. Burns*, 540 F. Supp. 1243, 1248 n. 3 (D. Colo 1982).

There is evidence in the record tending to show that ShopTV published false statements regarding Eagle's product.  On July 18, 2007, ShopTV sent an e-mail to BB&B stating, *inter alia*, "I believe the product from China is tempting but, frankly, the quality is so poor, it is not worth selling."  (Bagus Decl. (doc. # 50-2) at p. 5 of 6); (Exh. 17 (doc. # 50-19) at p. 4 of 4).[3]  On August 2, 2007, ShopTV sent an e-mail to BB&B noting, *inter alia*, that "the Carry-On Kit is 100% Made in the USA! Our bottles are made from the finest, Squeezable plastic and both our bottles & jars are Leak-Proof, Shatter-Proof and Leach-Proof! (We considered importing our product from China but opted not to for quality issues!)."  (Bagus Decl. (doc. # 50-2) at p. 5 of 6);  Exh. 18 (doc. # 50-20).  On August 29, 2007, ShopTV sent an e-mail to BB&B reiterating "a few important features of our 100% Made in the USA Carry-On Kit: Our Jars have liners in the lids so they are absolutely leak-proof unlike the China imports. Our bottles are made from soft squeezable plastic so they do not shatter or crack like the China imports. Our spray bottle is really easy to use while the Chinese sprayers are much more difficult." (Bagus Decl. (doc. # 50-2) at p. 5 of 6);  Exh. 19 (doc. # 21).  At the time these emails were sent, ShopTV did not have access to a physical sample of Eagle's Travel Mate product.  (Bagus Decl.) (doc. # 50-2) at p. 5 of 6).  On January 31, 2008, ShopTV sent a letter to Eagle, with a copy to BB&B, stating, *inter alia*, that Eagle's Travel Mate product "is an import from China leading to issues of quality, health, and safety."  (Bagus Decl.

---

[3]     The bottles and jars in the Eagle Travel Mate product are manufactured in China. (Stahl Depo. (Exh. 21) (doc. # 50-23) at p. 4 of 8).

(doc. # 50-2) at p. 5 of 6);  Exh. 23 (doc. # 50-25).   The letter also stated that "Shop*TV, Inc., has recently been allowed patents on our 'Carry On Kit' product . . . ." *Id*.  On February 20, 2008, ShopTV sent a letter to BB&B, stating, *inter alia*, that "of further concern is the fact that Eagle's 'knock-off' product is manufactured in China and, if confused with the Shop*TV's quality item, will cause damage to not only my client, but also the representations of distributors who sell these items."  (Exh. 24 (doc. # 26) at p. 3 of 4). The same letter also stated that Shop*TV's design patent application "has been allowed." *Id*.

Thus, in 2007 and 2008, ShopTV made statements to BB&B that the bag used in Eagle's travel kit was weak and would tear, and that the bottles leaked, were capable of shattering or cracking, and posed a cancer-risk to buyers because they leached unspecified plastic components into the liquids, creams, or gels contained therein. Eagle contends that all of these statements of fact were false.  The evidence before the court indicates that Mr. Bagus had not inspected or tested Eagle's travel kit and did not know what material was used to make the bottles and jars in the Eagle product, whether the bottles and jars were made of squeezable plastic, would leak, shatter, crack, or leach any cancer-causing product into the liquids or creams contained therein, or whether the bag used in Eagle's product was weak.  (*See, e.g.*, Exh. A (Bagus Dep.) (doc. # 54-2) at p. 7 of 27).  The court concludes that there are at least genuine issues of material fact as to whether ShopTV acted with knowledge of the falsity or reckless disregard for the truth of these statements and whether it made the statements intentionally and maliciously in order to damage Eagle's reputation and business. Genuine issues of material fact also remain regarding ShopTV's contentions that these

37

were statements of opinion as opposed to statements of fact, whether the statements
specifically referred to Eagle's product, and whether the statements were made with
malice and intending to cause harm to Eagle.

ShopTV argues that because Eagle cannot identify any lost sales resulting from
ShopTV's statements, Eagle cannot demonstrate special damages.  Special damages
are one of the elements of a cause of action for product disparagement.  *See Teilhaber
Mfg. Co.*, 791 P.2d at 1167 ("If a plaintiff cannot show special damages, no cause of
action is established.") (citation omitted).  "To make the required showing, a plaintiff
usually must identify those persons who refuse to purchase his product because of the
disparagement."  *Teilhaber Mfg. Co.*, 791 P.2d  at 1167 (citation omitted).  However, "[f]
it is not a practical possibility to show specific losses, damages may then be proved by
evidence similar to that used to prove lost profits resulting from a breach of contract."
*Id*.  "Consequently, if a plaintiff can present sufficient evidence, using detailed statistical
and expert proof, to exclude the possibility that other factors caused the loss of general
business, recovery is allowed."   *Id*. (citation omitted).

Eagle has evidence to present at trial that it lost sales due to delay resulting from
ShopTV's false statements.  In response to ShopTV's statements regarding Eagle's
product, BB&B requested design changes and delayed the purchase of travel kits from
Eagle.  Eagle was forced to spend time and effort dispelling ShopTV's alleged false
statements and made a design change to include lid liners in its bottles and jars,
although there was no evidence that the lids to its jars and bottles leaked.  (*See, e.g.*,
Exh. 25 (doc. # 50-27), Exh. 20 (doc. # 50-22) at p. 4 of 6, Exh. 22 (doc. # 50-24); Exh.
1 to Motion to Strike (doc. # 61-2) at p. 4 of 7; Exh. A (doc. # 72-2) at pp. 2-3 of 5; Exh.

38

D to "Opposition to Plaintiff's Motion to Strike" (doc. # 72-5).  The court concludes that summary judgment is inappropriate at this time on the Fourth Counterclaim for common law unfair competition.

Accordingly, IT IS RECOMMENDED that:

1.      "Defendants' Motion for Summary Judgment" (filed October 30, 2009) (doc. # 49) be GRANTED IN PART and summary judgment be entered in favor of Defendants and against Plaintiff on the First Claim for Relief for patent infringement and DENIED IN PART on the Second Claim for Relief for trade dress infringement.

2.      "Plaintiff's Motion for Partial Summary Judgment" (filed October 30, 2009) (doc. # 50) be DENIED.

Further, IT IS ORDERED that "Plaintiff's Motion to Strike Portions of the Second Declaration of Robert Chemtob (Dkt. 54-9)" (filed December 4, 2009) (doc. # 61) is DENIED without prejudice as the court did not consider paragraphs 8-11 of Robert Chemtob's Second Declaration (doc. # 54-9) in evaluating ShopTV's Motion for Partial Summary Judgment.

**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583

(10th Cir. 1995).  A general objection that does not put the District Court on notice of the

basis for the objection will not preserve the objection for *de novo* review.  "[A] party's

objections to the magistrate judge's report and recommendation must be both timely

and specific to preserve an issue for de novo review by the district court or for appellate

review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street,*

*Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely

objections may bar *de novo* review by the District Judge of the Magistrate Judge's

proposed findings and recommendations and will result in a waiver of the right to appeal

from a judgment of the district court based on the proposed findings and

recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80

(10th Cir. 1999) (District Court's decision to review a Magistrate Judge's

recommendation *de novo* despite the lack of an objection does not preclude application

of the "firm waiver rule");  *International Surplus Lines Insurance Co. v. Wyoming Coal*

*Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain

portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal

those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir.

1992) (by their failure to file objections, plaintiffs waived their right to appeal the

Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122

(10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require

review).

DATED at Denver, Colorado, this 19th day of January, 2010.

BY THE COURT:


    s/Craig B. Shaffer
United States Magistrate Judge